I do have a motion. Chief, I move the admission of Ji Hong Lo, who is a member of the Bar and is in good standing with the highest courts of the United States Supreme Court, California and the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Now, it is fairly common when a judge moves the admission of his or her law clerk to the bar of our court to say good things and how the law clerk has performed so well and is so bright. But I have further backup to my belief. I wouldn't let Ji Hong go after her two-year term ended. I asked her to become career law clerk and happily she agreed. So I think with all of that, it's clear that the motion should be granted and I ask the panel to grant the motion. Well, I'm delighted. We're long-term neighbors now, so we're very happy at your permanent presence and welcome to the Bar. This morning. Please raise your right hand. Do you solemnly swear or affirm that you will report yourself as an attorney and counsel of this court uprightly and according to law and that you will support the Constitution of the United States of America? I do. Welcome to the Bar of the United States Court of Appeals. I do so. Congratulations. Okay. Now, the first case for argument this morning is 15-1925, Cooper v. Square, Inc. Mr. Greenspoon, now we're ready for you. Yes, thank you and good morning, Your Honors. Today I would like to call out two grounds for non-anticipation on the 005 and 207 patents and one ground for non-anticipation on the 875 patent. And, of course, I remain available for questions on any other issues that are raised in the briefing. Your Honors, even on substantial evidence review, this court has been quick to reverse in situations where it's found that no reasonable mind could take the evidence supplied to argue anticipation and come to that conclusion. And here, no reasonable mind could. A prior art reference does not disclose the claim or the claim limitation in this case. When the proponent's expert concedes, and I quote, it's not specified in the prior art. And that quote is taken from A1229. Right, but which is the element as to which that statement was made? That is the element, the emitter element with different phrasings, but it's an emitter that must transmit credit card-related information. So the disclosure that needed to be in the prior art to satisfy this limitation was the wireless transmission of credit card-related information. So, Your Honors, I took that deposition and I directed the expert to exactly where he had stated in his declaration that that element is contained, walked him through it, and he impeached himself because he had to answer under oath and truthfully, and he explained that it's not specified in the document that that's there. I'm sorry, just say again, what was the page in the joint appendix where that occurs? Yes, sure, that was A1229. Just under, I think, the middle of the page you'll see a standalone answer, it is not or it's not specified. So that was the wireless credit card account information transmission limitation of 005 and 207. And what was astonishing, and we called it that in our blue brief, is though we had raised this in our briefing before the Patent Trial and Appeal Board, the PTAB, the final written decision never acknowledges the existence of this testimony. It just blows right by it. And we contend that the PTAB actually invented on top of Petroda itself in its ultimate finding that it found the claim limitation to be present. Its entire analysis comes in a single sentence. And allow me to read that. Petroda's IRRF option. Were you reading from A37? Yes, now I'm reading from A37. And just as an aside, two of the three final written decisions here are virtually identical. So you'll find this quote in another of the decisions. But, quote, Petroda's IRRF option is provided. It's right smack in the middle of the page. Correct. As an alternative means of communication of the information required to be communicated by the UET card to the CIU. That's the PTAB's analysis. But in reality, as we briefed and as Square's expert admitted, this level of detail just isn't present in the reference. The record supports that. Something else is doing something similar. It's the pin contacts. These are mechanical conductive pins, not the IRRF option. And that's how Petroda, the reference we're talking about, gets the credit card related information off of its card. So for the support that it's the pin contacts that do this, it would be in the Petroda document itself at column 16, lines 35 through 41. And lest there be any doubt, this is the section of the patent where I would commend Your Honor's attention to column 15, line 65. This is the part of the patent that starts to finally get into what happens during a transaction. So the only place in the prior art patent where it starts talking about what's happening in a transaction, it talks about the mechanical pin contacts. So there's no wireless transmission of that kind of information, and that would have been required for a sound anticipation holding. These patents have all expired, right? That is correct, Judge. Yes, Your Honor. And the prior art is really contemporaneous. In other words, this art was developing at the same time, and a lot of patents were filed on the same very closely related technology, and the Petroda and the Katinas references just beat yours. The Patent Office decided substantial evidence. You're jerking my art chains, but yes, Judge Lurie, we acknowledge their prior art, though. We don't try to overcome that. And that's actually commonplace, as Your Honor is aware, for a lot of development in a field to go on and a lot of more or less simultaneous patents to be cropping up at about the same time. There probably weren't interferences here, were there? No, there's no record of that, and I'm not aware of that, Judge. Moving on to the second gap in Petroda, that's that it never has the card microcontroller, the UET card microcontroller, actually perform the memory writing of credit card-related information. Again, the clear disclosure is that something else does it. There's what we call the CIU. That's an outside device that mechanically couples to the pin contacts. And then I'm using a hand gesture, but it bypasses the microcontroller to drop that kind of information into the nonvolatile RAM. Where's the description of the bypassing? If I remember right, the figure shows a little line. This is the nonvolatile memory off to the right side of the figure, and then there's a little line connecting it to the controller. But you say that there's some outside device that's actually controlling that. Correct. So where are the words that would be? Because the picture would not suggest that, so where are the words? That's a fair reading of the picture, but, of course, the pictures have to be understood in light of the disclosure. So I would commend Your Honor's attention to Column 11. And it's Column 11 in Petroda. It's A398. And it's near the bottom of the paragraph that starts at line 12. So what I'm going to direct Your Honor's attention to is line 24. Pin contacts 38 to connect to the memory. It says with direct contact to connect to the CIU. Correct. And then just prior to that there's… I guess it seems to me it would be stronger if the words to connect weren't there. Well, in full judge it says, touch memories with direct contact to connect to the CIU. Direct contact. And there's actually no dispute among the parties that that is a disclosure of an embodiment that does this kind of bypass that I'm mentioning. At page 34, note 12 in the red brief, even Square acknowledges that there is a disclosure of what I'm describing. It's the CIU drops the credit card information into the memory bypassing the microcontroller. So if you compare the panel's analysis to what Petroda actually discloses, you'll see that none of the Petroda excerpts cited by the panel actually gives a role to the microcontroller to do this job. If that were disclosed, we would see the panel citing to a place in Petroda which says, oh, by the way, the microcontroller drops credit card related information into the memory. But it just never says that. We characterize it in our blue brief as a so-called thin device. It's thin in the sense, this is our verbiage at the appellate court level, but it's thin in the sense that it doesn't have the full range of functionality that, for example, Mr. Cooper's card did. Now moving on to the 875 patent. Here we have another clear expert admission, in our view, preventing the existence of substantial evidence. And in this particular case, to meet the claim, Keekiness, which is the prior art we're talking about, would have to disclose the display of credit card related information. But here, Your Honors, I direct your attention to A1155-56. This is where Square's expert admitted that it's not there. I mean, if I had to rank them, I would say that this is an even more clear admission than the prior one I discussed. And again, Your Honors, I submit there cannot be substantial evidence of anticipation, evidence on which a reasonable mind can depend, if the proponent's expert says it's not there. And we show in our brief that the PTAB did make an effort to get around this testimony. But what they did is they built what I'm going to characterize today as a firewall. They put a firewall around two particular sentences in Keekiness, and they made an assertion, effectively, that Mr. Dreyfus didn't include those two sentences within the scope of his admission. But the record just did not support that, and we demonstrate that at pages 21 to 23 of our reply brief. Square's expert made his admission about the entirety of the relevant Keekiness disclosure. He did not put in any provisos or caveats, and the content backs this up. Your Honors, I see I'm into my rebuttal time. Yes, why don't we hear from the other side? Thank you. Thank you. Good morning, Your Honors, and may it please the Court. All the evidence, all the issues that Mr. Cooper raises today are issues that take issue with the Board's findings of fact. And, of course, those are reviewed for substantial evidence. And the only thing that this Court looks at is whether any reasonable person could have reached the same conclusion that the Board did. And all of the Board's findings survive that level of scrutiny. So are you saying with respect to the comments that he challenges that your expert made that the Board read those differently? Or are you saying that their right was just as competent and the Board had a right to do that? I was saying both, Your Honor. Both the Board read it differently and had a right, as a finding of fact, to read the evidence in a different way. And also the Board independently relied on the evidence from the patents themselves. And I'll show that with respect to each of these limitations, which is itself substantial evidence independent of what the expert testified. So with respect to the emitter limitation, the requirement is there is for wireless transmission of account information. And it's undisputed that the UET card of Petroda transmits account information. That's in Column 16. But it's a combination of Column 16 and the disclosures in Column 9 that lead to the wireless transmission of account data. And what the Board found was that it's an either-or scenario. There are two embodiments disclosed. And I'm going to quote here from Column 9. The UET card communicates, quote, Either through physical metallic contact preferred for the touch memory devices, that's the wired embodiment. Now I'm quoting again. Or infrared or radio frequency-based wireless transmit and receive units. That's the wireless embodiment. And which of these alternative communication paths the UET card uses, it depends on the particular embodiment, whether it's wired or wireless. And I'm quoting now from the second excerpt that the Board relied on where it says the CIU includes means for receiving data. What are you reading from? I'm sorry. I'm reading from Column 9, lines 59 to 63. That's A397. And I'm also reading from A13. And as Mr. Greenspoon pointed out, there are nearly identical final written decisions here for the two. So I'm quoting from the 005 final written decision. And this is the language that the Board specifically relied upon to support its conclusion that there's wireless communication of account information. And, again, what I was just about to quote was it says, Depending upon the system used by the UET card. And that's, again, lines 59 to 63. So what the Board found is that these are alternative means for providing information.  So when it's a touch memory device, it communicates the account information via the pin contacts. That's correct, and that's what's disclosed. But when it's a wireless embodiment, it transmits wirelessly through the infrared or radio frequency, which is Item 39 of Figure 3. Now, Mr. Greenspoon said that the Column 16 disclosure refers to the metallic pins. Now, that's not correct. All that the disclosure in 16 talks about is that there's a connection. It's that there's a connection between. I may be mixing things up, but I'm hoping not. So Mr. Greenspoon, I think, called our attention to Mr. Dreyfus' statement at 8.12.29, which is about Column 9. Would you agree that there's no disclosure of exactly what is to be transmitted via RF or infrared? It's not specified. I agree that that is Mr. Dreyfus' testimony, that in Column 9. So what do you make of that, or more importantly, what did the Board make of that? So the Board relied on the combination of both Column 9 and Column 16, as did Mr. Dreyfus, because it is the disclosure of the either-or functionality in Column 9 that says, if the UHC card is a wired embodiment, the information goes over the pin contacts. If it's a wireless embodiment, the information goes over the IR RF. So he was giving one of those common deposition answers that was focused just like this. You asked about Column 9. I'm going to give you an answer about Column 9. That's right, Your Honor. And although it's not in the joint appendix, though, if you read on in the testimony from 12.29 to 12.36, Mr. Dreyfus explains his combination of Columns 9 and 16. It's just that part just isn't, and we're happy to provide that. We just didn't put that in the joint appendix. But his declaration testimony and his deposition testimony are perfectly harmonious. And the Board did or did not rely on those portions of Mr. Dreyfus' testimony? The Board did rely on those, but as an independent basis for its conclusion. It independently also relied on, if you look at A13, where the Board is talking about its conclusion, it's relying on those Columns, on Column 9 disclosures that I just quoted to the Board, to this Court. Forgive me. The Board, Mr. Greenspan also said that the Board did not consider Mr. Dreyfus' testimony at all. And that's just not correct. What the Board did is consider the argument that was based on Mr. Dreyfus' testimony. It cited in particular a three-and-a-half-page portion of the Patenone response. Most of those three-and-a-half pages are a block quote of Mr. Dreyfus' testimony that's at issue here. So the Board referred to those pages, referred to the argument. This is at A1039-1042, is the relevant portion of the Patenone response that the Board referred to. And as the Court can see, Mr. Dreyfus' testimony is the vast majority of that. So the Board, specifically referring to those pages and addressing that argument, is in fact addressing Mr. Dreyfus' testimony and whether it's in any way inconsistent with his declaration. So moving to the control circuit limitation, which is the second issue from the 005 and the 207 patent. So here, what Mr. Cooper argues is that the only thing that performs the memory storage function from the UET card is this external device called the Communication Interface Unit, the CIU. But the Board said, the Board concluded to the contrary, and there's substantial evidence, in fact, extensive evidence supporting the Board's conclusion. By the way, I mean, do you agree with, I think, what Mr. Greenspoon said, that you read that passage that he read from whatever the column was, I don't remember, that refers to a direct contact to connect to the CIU means a direct contact to the CIU rather than a direct contact to some intermediate thing like the controller? Well, the testimony from Mr. Dreyfus was that the direct contact didn't require bypassing the microcontroller. We've never agreed that there's bypassing the microcontroller. All we've said is that the CIU can write in our footnote. The CIU can write to memory. And that was footnote what? I can't recall offhand. Was that 3412? I believe so, Your Honor. That's right. But let's look at the disclosures that are actually there and that the Board relied on. So Petroiter discloses, first of all, as Judge Taranto pointed out, there is a line from the microcontroller to the memory, memory 34, and memory 33 is directly within the microcontroller box. So there's a direct connection between those. And then Petroiter discloses in four separate places that it's the UET card and not the CIU that performs the memory storage function. And I just want to focus on one of those, which is at page 394 of the appendix, column 3, lines 11 to 14. And what it says is Petroiter discloses that the information stored, transmitted, or received by the UET card may include, and I have ellipses here, account information for each service institution. So stored, transmitted, or received by the UET card. So if information is transmitted by the UET card, the UET card is doing the transmitting. If information is received by the UET card, the UET card is doing the receiving. Likewise, if information is stored by the UET card, the UET card is doing the storing. And so there's no passive, so this isn't used in the passive sense here. That sentence shows that the UET card is what is doing the storing. And there are three other excerpts we rely on in our brief. I won't read them into the record, but they're on pages 32 and 33 of the red brief, where each one of those excerpts that the board relied on to find substantial evidence that it's the UET card that's doing the writing to memory here. And the board relied on something more. The board relied on the disclosure, this is in columns 11 to 12, 11 to 40, to 12.6, of the software blocks for the UET card. Now, this isn't software that's external to the UET card. This isn't a thin device. This is a device with a microcontroller, a database on it, and software. And the board relied on the fact that it has software on it, and the software has database management and memory management functions. And relying on squares expert, Mr. Dreyfus, and also relying on disclosures within Petroda, the board concluded that it is the microcontroller of the UET that performs this database and memory management, which includes not just reading but writing to memory. It has storage that is disclosed. So storage is disclosed as being performed by the UET card generally and also being done by the microcontroller based on these software blocks and the fact that the microcontroller runs the software, that's undisputed, and the software is database management and memory management. And relying on Mr. Dreyfus' testimony and on the disclosures, especially column 18, lines 18 to 20, the board found that the microcontroller is what performs the storage and memory. And that's at pages A, it's A15 to 16, which the board adopted on A17. Now, finally, the board relied on one more thing, and that was that there's memory within the microcontroller block. That's memory 33. And when that memory, and relying on Mr. Dreyfus, Square's expert, the board found that when memory is stored, when account information is stored to that memory, it's simply impossible for the CIU to store anything to that memory. By the way, I don't remember the answer, maybe it was given, but what is the B plus box in that picture, in figure three? Off to the left. Let's see. 301. I think it's the battery, Your Honor. That's the battery. I believe so. Thank you. I should have figured that out, sorry. No problem. So the CIU cannot write to memory 33, and there seems to be no dispute about that. So when account information, as Mr. Dreyfus testified, is written to RAM 33, that is performed by the microcontroller of the UET card. So finally, turning to the display limitation in the 875 patent, this requires, Your Honors will recall, a display that's configured to display some amount of credit card information. And the board here relied on A4064, so 4064, the appendix, column 14, and a disclosure that it identified as the disclosure at 1, bracketed 1, to distinguish it from a later disclosure, which is the disclosure of bracketed 2. And they're introduced by a different language. One of them is this aspect, and one of them is in one aspect. It refers to a subset, a telephone call aspect. And what the board found is that the language in that disclosure, the unique control routines and display configurations, and I'm paraphrasing here, but this is 14 and 36 to 41, those display configurations, in conjunction with credit card numbers, ensure that the information stored in the device, the Kikinis device, is readily available and may be quickly and conveniently accessed and used. And from that, the board concluded, as a matter of fact, that this disclosure reflects the action of displaying credit card account information. And I'm reading there from A63. And this finding, the board based its finding on the direct disclosure in Petroda. Excuse me, in Kikinis. I said Petroda, I meant Kikinis. And that itself is substantial evidence. Now what Mr. Cooper argues is that, well, your expert said something different in his deposition. But that's not correct. The board looked specifically at that issue and looked at what the expert testified. And what happened was that, and the key testimony on this is on 4642 of the appendix. The top of that page, what Mr. Greenspoon did, is direct the expert to the disclosure at 2, the one aspect information. Read it aloud into the record. And then asked a series of questions about that disclosure at 2. The expert answered those questions. And the board looked at that testimony and said, in context, the expert was answering about the disclosure at 2. So, at worst for Square, this is ambiguous testimony. I don't think it's ambiguous. Square wasn't confused. The board wasn't confused. The only one confused here is Mr. Greenspoon. And he could have clarified this. He could have asked the expert, are you repudiating your prior testimony? What do you make of the disclosure at 1? Are you saying, what do you say about this? Do you take that position? I do, Your Honor. But this is the risk of relying on an ambiguity. The fact finder may disagree with you. If you rely on ambiguity and the fact finder disagrees with you, you're stuck. Ambiguity is resolved in favor of the board under substantial evidence review. And the board was well within its rights to decide that this testimony is ambiguous. Now, Mr. Cooper makes a couple of arguments in his reply brief that he didn't mention here today, but I want to respond to those. One of them is that we should read out of existence the words display configuration because the words control routines also appear. But control routines and display configurations are explicitly linked in the Kekanist disclosure. And I just would refer the court to column 7, lines 27 to 29, which says that the thumbwheel controls the configuration of display according to control routines. And column 2, lines 30 to 32, that says control routines operate in conjunction with the display. So there's no separability between the control routines and the display configurations. They're part and parcel of one another. And then finally, Mr. Cooper argues that the board couldn't have interpreted the disclosure at 1 any differently than the disclosure at 2 because the disclosure at 2 is just a straight elaboration of the disclosure at 1. And that's not correct. The disclosure at 2 is a subset. It's a species, if you will, of the genus from the disclosure at 1. It's a particular telephone conversation that occurs. So for these reasons, I respectfully ask the court to affirm the ruling. Starting with the last thing first. Let me read to your honors the testimony showing what is a tunnel vision Q&A examination with Mr. Dreyfus. I did direct him to the exact text starting on line 41 of the reference about the things that are displayed in Kekanist. And then moving on, I ask, there's no other aspect disclosed besides that. That's really the only aspect. I'm sorry. You're reading from A4642? I am reading from it. Actually, it might be a second place in the record where the deposition exists. It's between A1153 and 1155. But I get him to these Q&As. There's no other aspect disclosed besides that. That's really the only aspect that's described. Right? Answer? That's the example he uses to teach. Yes. There's no other disclosure than that of what is shown on the display for the cellular telephone interface functionality. Answer? In the patent body, that is what is explained. Yes. That was not tunnel vision question and answer. That was, I asked him for everything. Give me all you got. And when we got to the four things that are displayed, it didn't include credit card related information. Going back, again, the middle issue, if you will. Your Honor, you directed a question about the B plus in figure three of Petroda. It's a battery. It is a battery. But what's interesting to note is this just demonstrates that you can't really trust these figures to be representative of how the device is built. Because if you look at B plus, it has an unconnected arrow pointing in the direction of the rest of the circuitry. And I think it just goes without saying that if it's a battery, it has to be, in reality, it's going to be connected. So then the figure is really very stylized, as we explained in our own brief about the very same type of stylization. We heard Mr. Angeles direct the court to certain columns and lines in Petroda where it says there's storage, transmission, and something else, quote, by the UET card, by the UET card. As we explained in our briefing, there are really two senses of store, the word store going on here. The precise sense that needs to be shown in the reference to meet the anticipation requirement is writing. There has to be a microcontroller that writes to memory. The more sort of broad or imprecise sense is what we call the passive sense of storing, which is the card as a whole can store a particular kind of information, even if it's something external to the card that's done the writing slash storage of that information to the memory. So when you actually look at all of the places in the reference describing the UET card storing something, it's always in the sense and in the context of it's a card that ends up holding it. Holding is an excellent way of describing that sense, yes. And finally, back to the first issue that Mr. Angeles started with, I raised my eyebrows. I heard when he started his talk, he said that what the board did is create a combination of column 16 and column 7 that led to the conclusion that there's something from column A and something from column B, and you combine them and there you have the claim limitation. We know from the net money in case and cases like that that you can't take the independent disclosures of a reference and combine them to come up with an anticipation theory. If there's an issue to be raised there on their behalf, it's going to be one of obviousness if you're going to go to combinations. And finally, back to the tunnel vision deposition style issue that Mr. Angeles brought up, let me direct your Honor's attention to when I asked Mr. Dreyfus questions about Petroda. And this is from a range 1228 to a 1230. I can't pinpoint exactly where in that, but here's my question. Now I'm going to ask you to confirm that those are the only places where radio frequency or infrared are discussed at all in the entirety of the Petroda patent. That is column 9, lines 59 to 62, and column 11, lines 25 and 26. Answer okay. And then I have a follow-up question, making sure that he actually took that as a question, and then his answer was, I believe so. That is the demonstration that in neither case were these tunnel vision Q&As that allowed the type of judicial allowances that we see in the PTAP to see. For all these reasons, I would respectfully ask that the court reverse the decision of the patent trial and appeal board. Thank you. We thank both counsel and the cases.